UNITED STATES COURT OF FEDERAL CLAIMS

FILED
APR - 6 2007
U.S. COURT OF FEDERAL CLAIMS

TRIGEANT, LTD.,
3020 Military Trail
Suite 100
Boca Raton, FL 33431,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

No. 07-222 C

**COMPLAINT**

Plaintiff, Trigeant, Ltd., for its Complaint, alleges as follows:

**The Parties**

1. Plaintiff, Trigeant, Ltd. ("Trigeant"), is a Florida limited partnership with its principal place of business at 3020 Military Trail, Suite 100, Boca Raton, Florida 33431. Trigeant is engaged in petroleum refining & marketing and oil trading.

2. At the time of contracting, and at all times relevant to this Complaint, Trigeant was a small business concern within the meaning of the Small Business Act, 15 U.S.C. §§ 631 *et seq.*, and 13 C.F.R. § 121.103.

3. Defendant is the United States of America acting, *inter alia*, through the Defense Energy Support Center ("DESC"). DESC is a field activity of the Defense Logistics Agency ("DLA"), which is part of the Department of Defense. One mission of the DESC is to supply petroleum products to support U.S. military forces, federal civilian agencies, and the policies of the United States.

## Jurisdiction and Venue

4. This Court has jurisdiction to entertain this action pursuant to 28 U.S.C. § 1491.

5. Venue is appropriate in this Court pursuant to 28 U.S.C. § 1491(b).

## Statement of the Case

The Solicitation

6. On January 21, 2004, DESC issued Solicitation No. SPO600-04-D-0054 ("Solicitation 0054") for the supply of several types of refined petroleum products (*e.g.*, diesel fuel, gasoline, and kerosene) to various locations in Southern Iraq. The purpose of Solicitation 0054 was to provide humanitarian relief and assistance to the civilian population in Southern Iraq.

7. On January 21, 2004, DESC issued Amendment 0008 to Solicitation 0054. Amendment 0008 established a base period of performance for the supply of gasoline and diesel of April 1, 2004 through June 30, 2004. Amendment 0008 also provided for three option periods as follows:

Option Period 1 - July 1, 2004 to September 30, 2004
Option Period 2 - October 1, 2004 to December 31, 2004
Option Period 3 - January 1, 2005 to March 31, 2005.

8. In accordance with Amendment 0008, offerors were required to specify the offered product(s), quantities, and unit prices for the base contract period and the three option periods in their proposals. For each period, offerors were to provide separate pricing for three tank truck convoy round-trip deliveries (known as "turns") per month, four turns per month, and five turns per month.

9. Solicitation 0054 contained an Option clause, Clause 22, which provided:

> *OPTION TO EXTEND THE TERM OF THE CONTRACT*
>
> (a) The Government may extend the term of this contract by written notice to the Contractor within 7 days, provided that the Government shall give the Contractor a preliminary written notice of its intent to extend at least 15 days before the contract expires. The preliminary notice does not commit the Government to an extension.
>
> (b) If the Government exercises this option, the extended contract shall be considered to include this option clause.

Trigeant's Offer

10. Trigeant's offer included a pricing proposal and technical proposal describing its logistics and transportation arrangements for tank truck deliveries of petroleum products into Iraq. Trigeant's offer was in US gallons ("USG") and US dollars ("USD"). Trigeant offered gasoline, diesel, and kerosene by tank truck delivery to the Ramadi destination only.

11. In accordance with Solicitation Amendment 0008, Trigeant's final proposal revision included gasoline and diesel unit prices based on three, four, and five turns per month. Trigeant's proposed prices were as follows:

| Product | Est. Qty. (USG) | Price (3 Turns) | Price (4 Turns) | Price (5 Turns) |
|---|---|---|---|---|
| Gasoline | 23,775,480 | $1.445463 | $1.435463 | $1.425463 |
| Diesel | 35,663,220 | $1.361534 | $1.351534 | $1.341534 |

Trigeant's proposed unit prices were the same for the base period and the option periods.

12. Trigeant's final proposal revision specified daily and monthly minimum/maximum tank truck quantities (in USG) for gasoline and diesel as follows:

| Product | Location | Daily Min. | Daily Max. | Monthly Max. |
|---|---|---|---|---|
| Gasoline | Ramadi | 180,000 | 290,000 | 8,150,000 |
| Diesel | Ramadi | 315,000 | 425,000 | 11,980,000 |

13. Trigeant's technical proposal contained a detailed description of the lengthy logistics pipeline Trigeant would establish to perform the contract, including:

a. Arrangements with an international trading company for product supply;

b. Arrangements with Jordanian companies to furnish tank truck convoys from Aqaba, Jordan to Ramadi, Iraq;

c. Arrangements to charter floating storage in Aqaba, Jordan for which Trigeant had the approval of Aqaba Port authorities;

d. Arrangements to build small storage and truck loading facilities in Aqaba; and

e. Arrangements for product testing and quality assurance in all stages.

Evaluation and Initial Award to SBIG

14. DESC received fifteen competitive offers in response to Solicitation 0054. In mid-March, 2004, DESC awarded the contract to Shaheen Business & Investment Group ("SBIG"). SBIG's contract was terminated for default shortly after award when SBIG failed to deliver both diesel and gasoline. DESC subsequently advised SBIG if its liability for excess reprocurement costs of $5,075,620 for gasoline and $4,949,481 for diesel. On May 27, 2005 DESC and SBIG entered into a settlement agreement. DESC, however, has declined to disclose the amount of the settlement.

Reprocurement Award to Trigeant

15. After DESC terminated SBIG's contract, DESC awarded the reprocurement contract, Contract No. SPO600-04-D-0490 (the "Contract"), to Trigeant on April 8, 2004.

16. The Contract required Trigeant to furnish only diesel fuel, delivered by tank truck convoys to Ramadi. The total estimated quantity awarded was 35,663,220 USG. The total

estimated dollar value was $48,556,686.48, based on Trigeant's price for 3 turns per month. Two days after award of the diesel requirement, DESC issued the first delivery order for diesel fuel.

17. On May 7, 2004, DESC issued Modification P00002 to the Contract adding gasoline deliveries also by tank truck convoy delivery to Ramadi. The estimated contract price increased by $28,400,300.91 to $76,956,987.39, again based on Trigeant's price for three turns per month. Accordingly, Trigeant's contract, as modified, specified the following products, quantities and prices:

| Product | Est. Qty. (USG) | Unit Price $/USG | Min. Daily Qty. (USG) | Max. Daily Qty. (USG) | Max. Mo. Qty. (USG) |
|---|---|---|---|---|---|
| Diesel | 35,663,220 | $1.361534 | 315,000 | 425,000 | 11,980,000 |
| Gasoline | 19,647,892 | $1.445463 | 180,000 | 290,000 | 8,150,000 |

18. The Contract included Clause 3 "Economic Price Adjustment," which adjusted the per gallon prices paid for each delivery based on increases or decreases in a published reference price in effect on the day of the delivery.

Contract Performance

19. Under the Contract, DESC placed delivery orders for diesel and gasoline. DESC issued nineteen separate delivery orders for diesel and gasoline during the contract base period of April 1, 2004 through June 30, 2004. Each delivery order specified the required quantity and the first and last day of the delivery period during which Trigeant was required to deliver the fuel. Delivery periods ranged from five or six day windows to fifteen or sixteen day windows.

20. DESC's delivery orders were subject to the contractual minimum daily, maximum daily and maximum monthly quantities.

21. Because of unfulfilled requirements due to SBIG's default, on April 22, 2004, DESC asked Trigeant for its concurrence to increase the monthly contractual maximum quantity for diesel from 11,980,000 USG to 13,175,000 USG. The purpose of the increase was to enable DESC to order deliveries of the maximum daily quantity of diesel (425,000 USG) for the entire month of May, 2004.

22. Trigeant agreed to DESC's request to increase the monthly contractual maximum. Trigeant notified DESC of the increased efforts it would take to meet DESC's increased requirement, including: (1) the purchase of two consecutive vessel cargoes of diesel fuel; (2) a new storage tank agreement at Aqaba, Jordan; and (3) expanded arrangements for tank truck delivery of products to Iraq. These actions allowed Trigeant to quickly increase its diesel delivery capacity from the original 11,980,000 USG per month to the 13,175,000 USG per month requested by DESC – almost 1.2 million USG beyond the original monthly maximum diesel requirement.

23. On April 26, 2004, DESC ordered Trigeant to increase the minimum daily quantities of diesel from 315,000 USG to 425,000 USG for the remainder of the month of April.

24. On May 14, 2004, DESC issued amendments to Delivery Order R106 for gasoline for the second half of May, 2004, increasing the daily quantity from the minimum of 180,000 USG (R106-01) to the maximum daily quantity of 290,000 USG (R106-05).

25. Beginning in mid-May, 2004, trucks delivering Trigeant's fuel began to back-up at the off loading point in Ramadi. The trucks were delayed, or prevented from unloading entirely at Ramadi, by causes beyond Trigeant's control and without Trigeant's fault or negligence. The truck unloading facility was controlled by the U.S. Government, not by Trigeant. As a direct result, Trigeant incurred increased transportation costs. In addition, Trigeant's revenues, which

were need to support its logistics pipeline dropped because Trigeant was paid only for fuel delivered and unloaded at Ramadi.

26. For both diesel and gasoline delivery orders, DESC began to amend the Contract delivery orders to adjust the quantity to be delivered to match DESC's actual receiving capacity at Ramadi. For instance, on May 15, 2004, DESC issued amended diesel Delivery Order R105-03, reducing the quantity ordered for the May 16 – May 31 delivery period from the original 6,800,000 gallons to only 2,700,000 gallons.

27. On May 19, 2004, DESC requested "if Trigeant would consider deliveries every other day of the daily minimum for the month of June." In other words, DESC wanted Trigeant to deliver only half the minimum quantity. On May 20, 2004, Trigeant declined, explaining:

> [W]e have made a significant financial and operational effort to secure enough product, storage and trucks to be able to deliver on a sustainable basis the daily maximum quantities of Diesel and Benzene [gasoline], and even more volume in case the DESC needed to increase the deliveries.
>
> We have more than 55,000 Tons of Diesel already in Aqaba (between the two terminals and a cargo of 40,000 Tons waiting to be discharged) and 48,000 Tons of Gasoline (15,000 Tons in storage and 33,000 tons on board of a vessel arriving the first week of June). We have signed a new and more expensive contract with a Transportation Company....
>
> We fully understand the requirements could have changed, but until few days ago the Delivery Orders and the communications from DESC were indicating to deliver the maximum quantities of both contracts until the end of June. We took all the actions to respond and now you need to reduce the deliveries below the minimum of both contracts or at the minimum every other day. As you can understand we can not accept to change the daily minimum delivery quantities of the contract and we hope you will be able to find discharge alternatives that will allow us restore the deliveries up to the maximum levels. (*Emphasis added*)

28. On May 23 and 24, 2004, DESC again sought to reduce quantities of diesel. DESC requested Trigeant to reduce deliveries to "less than the minimum daily quantity" because of a backlog of trucks at Ramadi. DESC acknowledged that its request could result in damages to Trigeant. DESC stated, "if by complying with the order request you experience any damages, Trigeant may submit a claim to the Contracting Officer for substantiated costs."

29. Trigeant could not comply with DESC's request to reduce quantities of diesel without incurring costs because: (a) Trigeant's logistics pipeline was full; and (b) commitments were in place for the contract quantities of diesel and gasoline. To mitigate Trigeant's damages, Trigeant proposed alternative destinations for the fuel, but DESC declined Trigeant's proposal.

Failure to Extend Contract

30. On June 3, 2004, DESC advised Trigeant, via email, that DESC would purchase more diesel fuel and gasoline by exercising Option Period 1 of the contract. DESC said:

> We want to inform Trigeant Ltd that ***DESC intends to exercise Option Period 1 to your contract SPO600-04-D-0490***. However, we request that Trigeant Ltd allow for order and delivery of lower minimum daily quantities to as low as 0 gallons when needed. This is essential as the plan is that DESC=s role in supplying humanitarian assistance is taken over by the Iraq government. ***The estimated quantities needed for July are:***
>
> ***Benzene (gasoline) 1.1 ML***
>
> ***Diesel 1.192 ML***
>
> We will issue a contract modification to make option period 1 effective. Please advise if you concur with lower daily minimums. (*Emphasis added).*

31. DESC was well aware that there was a lead time of several weeks associated with delivering fuel to Iraq. Trigeant had to purchase diesel and gasoline (benzene) from distant refineries, charter vessels to transport the fuel to Aqaba, Jordan, arrange suitable bulk storage in Aqaba, and arrange for truck convoys to transport the fuel from Aqaba to Ramadi.

32. Upon receipt of DESC's June 3, 2004 notice, Trigeant acted prudently by incurring reasonable costs to ensure that Trigeant would be able to timely perform the extended contract on July 1, 2004. For example, Trigeant continued to incur the costs of: (1) purchasing diesel and gasoline from its supplier; (2) vessel transportation; (3) bulk storage subcontracts in Aqaba; and (4) maintaining its tank truck delivery capability to Ramadi. In short, Trigeant reasonably relied, and relied to its detriment, on DESC's June 3, 2004 notice.

33. Had Trigeant not prepared for performance of Option Period 1 by buying gasoline and diesel fuel, transportation, storage and trucking services, Trigeant risked default under the Termination for Cause clause, Clause I1.03-3.100(m), of the Contract.

34. On June 4, 2004, Trigeant and DESC began negotiations on the quantities and contract minimums for July and August, 2004, the first two months of the first option period. These negotiations reinforced Trigeant's belief that additional fuel, transportation, storage, and trucking services were necessary to perform the extended Contract.

35. On June 7, 2004, Trigeant responded to DESC's request for lower contract minimums for the first option period. Trigeant explained that it had 30,000 metric tons ("MT") of gasoline in storage and in vessels and 38,000 MT of diesel in storage and/or in vessels committed for delivery to Aqaba, Jordan. Trigeant purchased products, chartered vessels, and leased storage at Aqaba solely for performance of the Contract. Trigeant advised DESC that:

> ***We will not be able to recover our costs in the event the DESC requires to cancel the contract or reduce the deliveries to these minimums*** ... we need to be able to recover our costs using the contractual minimum volumes as the reference for any claim we will have to submit in the event we are requested to under perform our contract for operational or safety reasons. (*Emphasis added*)

Trigeant's reasonable expectation, induced and reinforced by DESC, was that this product would be purchased during the base and option period of the Contract.

36. On June 7 and 8, 2004, DESC's and Trigeant's negotiations concluded with agreement on the July and August, 2004 optional and minimum quantities. Trigeant and DESC agreed upon an estimated total of 16,091,000 USG of diesel fuel, with a minimum total of 9,779,000 USG of diesel fuel, and an estimated total of 15,348,000 USG of gasoline, with a minimum total of 9,028,000 USG of gasoline. Upon conclusion of the negotiations, DESC informed Trigeant:

> For September, we will contact you in mid-July to discuss the estimated quantities and minimums and plan to finalize the estimated quantities for September by August 5.

37. To Trigeant's complete surprise, on June 22, 2004, DESC reversed course and advised Trigeant that DESC would not extend the contract beyond June 30, 2004.

38. On July 8, 2004, and July 12, 2004, Trigeant sought guidance from DESC about mitigation of damages, including sale of diesel and gasoline awaiting delivery under the Contract. The diesel and gasoline was then in storage in Aqaba, Jordan. On July 13, 2004, DESC advised Trigeant that decisions regarding the disposition of product and mitigation of damages were solely Trigeant's responsibility.

DESC's Failure to Purchase Minimums ("Underlifting")

39. Underlifting of fuel occurred when: (a) DESC issued delivery orders for less than the quantity needed to meet the contractual daily minimums; or (b) DESC issued delivery orders for sufficient minimum quantities but then did not accept delivery of the contractual daily minimums.

40. During two periods in May and June, 2004, DESC failed to order the required daily minimum of diesel fuel. DESC underlifted 2,184,688 USG of diesel under Delivery Order R-105 for the period of May 16–31, 2004, and underlifted 1,382,870 USG under Delivery Order R-108 for the period of June 1–15, 2004. In summary, DESC underlifted a total of 3,567,558 USG of diesel.

41. In June, 2004, DESC failed to accept delivery of less than the contractual daily minimum of gasoline ordered. DESC failed to accept (underlifted) 2,414,320 of gasoline under Delivery Order R-110 for the period of June 16–30, 2004.

42. During base contract performance, DESC underlifted a total of 5,981,878 USG of fuel.

43. Although DESC underlifted fuel in late-May and June, the Delivery and Ordering Periods clause, Clause 8 (d), permitted DESC to require the delivery of those ordered volumes in July. As a result, Trigeant was required to have sufficient products, tankage and trucks on-hand and ready to meet the July option quantities as well as the underlifted fuel from late-May and June.

Unlifted Option Period Quantities

44. DESC's June 3, 2004 notice that Option Period 1 would be exercised required Trigeant to incur product and storage costs to be able to continue performance on July 1, 2004. To be able to deliver at least the minimum agreed-upon July and August, 2004 option quantities plus the underlifted quantities remaining from the base contract period, Trigeant would need 13,347,000 USG of diesel and 11,442,000 USG of gasoline.

45. As of June 30, 2004, Trigeant's inventory in Aqaba was 4,700,581 gallons of diesel and 7,198,400 gallons of gasoline. These quantities did not exceed the inventory Trigeant reasonably expected would be required. Trigeant acted reasonably in having more fuel in inventory than the

mere underlifted quantities when DESC notified Trigeant that the first option period would not be exercised after all. Trigeant was forced to dispose of all the inventory after receipt of DESC's notice.

Effects of Unlifted Fuel

46. DESC's underlifting of diesel fuel and gasoline and failure to exercise the first option resulted in Trigeant having to sell undelivered fuel to a third party at lower prices than Trigeant would have received under the Contract, thus damaging Trigeant.

47. DESC's underlifting also caused fuel stored for Contract use to back up in Trigeant's leased storage tanks in Aqaba. Trigeant incurred additional cost to store the leftover fuel pending sale to a third party.

48. The back-up of Contract fuel in Trigeant's storage tanks in Aqaba caused delays to ocean vessels (the MAURANGER and the CHATTERGEE) waiting to offload new fuel for the Contract because of insufficient storage space in Aqaba. Trigeant had to pay demurrage to the vessel owners for the delays. One tanker (the CHATTERGEE) was prevented from offloading fully and Trigeant had to ship the remaining cargo for sale elsewhere at prices lower than Trigeant would have received under the Contract.

49. DESC's underlifting of base contract quantities and failure to exercise the first option forced Trigeant to enter into hedging transactions for the physical quantities of diesel and gasoline remaining in storage in Aqaba. Trigeant undertook these transactions not for speculative purposes, but in a good faith effort to mitigate damages. Trigeant's hedge transactions were in accordance with standard commercial practices so as to reduce exposure to the price volatility of international oil markets. Trigeant entered the hedge transactions solely to

reduce the risk caused by DESC leaving Trigeant with large quantities of undelivered products in storage. Trigeant experienced significant losses on these hedging transactions.

Additional Fuel Trucking Costs

50. Trigeant incurred additional trucking costs, because Trigeant's trucks were delayed waiting for loading at Aqaba due to underlifting, waiting for U.S. military escorts at the Iraqi border, and waiting to unload fuel at the dropping off point in Ramadi, Iraq. These additional costs totaled $647,100.

51. As a result of the DESC underlifting, Trigeant incurred $11,024 in fees at the Jordanian border for trucks re-entering Jordan, after DESC failed to accept delivery of fuel in Iraq.

52. A fee of $35,192 was incurred as a result of an after-imposed regulation issued by the Jordanian Government. These costs were an unknown and unanticipated by Trigeant at the time of bidding.

Trigeant's Certified Claim

53. On November 24, 2004, Trigeant submitted a certified claim under the Contract to the DESC Contracting Officer in the amount of $11,139,235 for increased costs incurred due to the DESC's failure to accept ordered fuel, failure to exercise the option, and delays at the Iraqi border and during unloading at Ramadi. Trigeant's claim included home office and Jordan office general and administrative costs and claim preparation costs.

54. By final decision dated April 13, 2006, the Contracting Officer denied all of Trigeant's claimed amounts except for portions of the base period underlifting storage costs and vessel demurrage fees totaling $404,227. Specifically, DESC allowed $80,024 for diesel storage

(Orders R105 and R108), $100,149 for gasoline storage (Order R110) and $224,054 for the MAURANGER demurrage.

**Count 1**
**Constructive Change (Failure to Order Diesel Minimum Quantity)**

55. Trigeant realleges and incorporates by reference the allegations in Paragraphs 1 – 54, above.

56. DESC's failure to order the base contract minimum daily quantities of diesel fuel under Delivery Orders R105 and R108 was a constructive change to the Contract.

57. Trigeant incurred additional unrecovered costs directly resulting from the change, including: (a) the costs of acquiring, storing, transporting and ultimately reselling at a loss the unlifted fuel, including unrecovered indirect expenses; and (b) the loss incurred in hedging the unlifted fuel.

58. Trigeant is entitled to an equitable adjustment in the contract price of $1,919,496, plus Contract Disputes Act ("CDA") interest.

**Count 2**
**Breach of Contract (Failure to Accept Gasoline Ordered)**

59. Trigeant realleges and incorporates by reference the allegations in Paragraphs 1 – 58, above.

60. DESC breached the Contract by failing to accept delivery of minimum daily quantities of gasoline ordered under Delivery Order R110.

61. Trigeant suffered damages as the direct and proximate result of DESC's breach, including: (a) the difference between the adjusted contract price for the late-June delivery period

and the actual price at which Trigeant resold the fuel; (b) the loss incurred in hedging the unlifted fuel; and (c) the CHATTERGEE demurrage payments and CHATTERGEE underlifting costs.

62. Trigeant is entitled to recover damages in the amount of at least $2,781,105, plus CDA interest.

**Count 3**
**Equitable Adjustment (Truck Delay, Detention and Fees)**

63. Trigeant realleges and incorporates by reference the allegations in Paragraphs 1 – 62, above.

64. Trigeant is entitled to an equitable adjustment due to DESC's actions in: (a) delaying tank trucks at the loading point due to quantity reductions, (b) delaying tank trucks in Trigeant's fuel convoys at the Iraqi border while waiting for U.S. military escorts, and (c) delaying tank trucks in Trigeant's fuel convoys while waiting to off-load fuel at Ramadi.

65. In addition, Trigeant is entitled to an equitable adjustment to compensate for fees which Trigeant incurred for tank trucks re-entering Jordan, after DESC failed to accept fuel which Trigeant had transported to Iraq.

66. Trigeant is entitled to an equitable adjustment, for the actions described in paragraphs 64 and 65, of at least $658,124, plus CDA interest.

**Count 4**
**Equitable Estoppel (Option Period Quantities)**

67. Trigeant realleges and incorporates by reference the allegations in Paragraphs 1 – 66, above.

68. At the time of the June 3, 2004 notice to Trigeant of the intent to exercise Option Period 1 and the subsequent negotiations regarding option period quantities, DESC knew there was a

substantial likelihood that the option would not be exercised. Trigeant was unaware of the likelihood that the option would not be exercised.

69. DESC intended that the June 3, 2004 notice lead Trigeant to make the necessary long lead-time advance arrangements to ensure uninterrupted performance during Option Period 1. Trigeant believed that DESC intended Trigeant to make those arrangements upon receiving the notice.

70. Trigeant relied on the notice and subsequent negotiations to its detriment by arranging for performance during Option Period 1 and thereby incurring costs which Trigeant was unable to mitigate upon DESC's later decision not to exercise the option. DESC is estopped from refusing to exercise Option Period 1.

71. Trigeant's is entitled to recover: (a) the difference between the adjusted contract prices for Option Period 1delivery period and the actual prices at which Trigeant resold the fuel; (b) the cost of storing unlifted Option Period 1 fuel prior to resale; and (c) the loss incurred in hedging the unlifted fuel.

72. Trigeant is entitled to recover the amount of at least $4,706,910, plus CDA interest, for DESC's failure to exercise the option.

**Count 5**
**<u>Misrepresentation (In the Alternative for Option Period Quantities)</u>**

73. Trigeant realleges and incorporates by reference the allegations in Paragraphs 1 – 72, above.

74. DESC, by giving the June 3, 2004 notice that Option Period 1 would be exercised, providing estimates of the amount of fuel required for Option Period 1, and subsequently

negotiating the estimated total and minimum monthly quantities of fuel for the July and August, 2004 portion of Option Period 1, made material misrepresentations to Trigeant.

75. Trigeant was entitled to, and reasonably did, rely upon DESC's misrepresentations by making the necessary long lead-time advance arrangements, and incurring significant costs, to ensure uninterrupted performance during the option period.

76. Trigeant's reliance on DESC's misrepresentations resulted in injury to Trigeant in the form of unrecovered costs incurred, including: (a) the difference between the adjusted contract prices for Option Period 1delivery period and the actual prices at which Trigeant resold the fuel; (b) the cost of storing unlifted Option Period 1 fuel prior to resale; and (c) the loss incurred in hedging the unlifted fuel.

75. Trigeant is entitled to recover the amount of $4,706,910, plus CDA interest.

**Count 6**
**<u>Mutual Mistake (After-Imposed Jordanian Fees)</u>**

76. Trigeant realleges and incorporates by reference the allegations in Paragraphs 1 – 75, above.

77. At the time of bid and contracting, DESC and Trigeant were unaware that the Jordanian Government would impose a new fee on trucks crossing the Jordanian-Iraqi border. If the parties had been aware that the new fees would be imposed, Trigeant would have incorporated those costs in its bid prices and the Government would have paid for them. The mistake had a material effect on Trigeant as it resulted in $35,192 in unanticipated additional costs.

78. Trigeant incurred unanticipated additional costs as a result of the new fees.

79. Trigeant is entitled to recover the additional costs in the amount of $35,192.

**PRAYER FOR RELIEF**

WHEREFORE, Trigeant requests judgment as follows:

1. Plaintiff requests that this Court enter a judgment against DESC in the amount of $10,100,827, plus CDA interest from November 24, 2004 and costs, or such further amount as established prior to judgment; and

2. Such other and further relief, including attorney's fees, as the Court may deem just and equitable.

Respectfully submitted,

April 6, 2007

Ronald H. Uscher
Peckar, Abramson, Bastianelli & Kelley, LLP
Two Lafayette Centre, Suite 500
1133 21st Street, N.W.
Washington, D.C. 20036
(202) 293-8815 (phone)
(202) 293-7994 (fax)

Counsel for Plaintiff
Trigeant, Ltd.